STATE of Wisconsin, Plaintiff-Respondent,

v.

Megan A. PADLEY, Defendant-Appellant.†

Court of Appeals

*No. 2013AP852–CR. Submitted on briefs November 15, 2013.
—Decided May 22, 2014.*

## 2014 WI App 65

(Also reported in 849 N.W.2d 867.)

† Petition for Review denied September 25, 2014.

549

550

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Marcus J. Berghahn* and *John D. Hyland* of *Hurley, Burish & Stanton, S.C.*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Thomas J. Balistreri*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Blanchard, P.J., Lundsten and Sherman, JJ.

¶ 1. BLANCHARD, P.J. Megan Padley was the driver of a vehicle involved in a fatal crash. There is no dispute that a sheriff's deputy who investigated the crash, and who subsequently directed a draw of Padley's blood, lacked probable cause to believe that Padley had alcohol or a controlled substance in her system. Nonetheless, relying on an amendment to the implied consent law effective as of 2010, Wis. Stat. § 343.305(3)(ar)2. (2011–12),[1] the deputy used an "Informing the Accused" form to require Padley to choose between consenting to a draw of her blood for purposes of a chemical test or being sanctioned with automatic penalties that include driver's license revocation. When put to that choice, Padley consented to a blood draw. A test of the resulting blood sample revealed the presence of a controlled substance, which the State relied on in this prosecution.

¶ 2. Padley moved to suppress the results of the blood test, arguing under a variety of rationales that the blood draw was an unlawful search, including that Wis. Stat. § 343.305(3)(ar)2. is unconstitutional, that her consent to the search was not voluntary, and that the deputy lacked "reason to believe" that she had committed a traffic violation, as required under § 343.305(3)(ar)2. The circuit court denied her motion to suppress. Padley now appeals that decision.

¶ 3. We conclude that Padley fails to demonstrate that Wis. Stat. § 343.305(3)(ar)2. is facially unconstitutional. We also conclude that there is no merit in her argument that her consent to the blood draw was not voluntary. Finally, we conclude that the circuit court did not err as a matter of law in determining that the deputy had the requisite "reason to believe" that Padley

---

[1] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

had committed a traffic violation and, thus, the deputy could rely on § 343.305(3)(ar)2. to put to her the choice of consent to a blood draw or automatic penalties. Accordingly, we affirm the decision of the circuit court.

## BACKGROUND

¶ 4. The facts are taken from an evidentiary hearing at which a sheriff's deputy was the only witness. The deputy responded to a highway crash involving a car and a motorcycle. Padley had been the driver of the car, and two people had been riding on the motorcycle. Before the crash, the motorcycle was behind the car on the highway, traveling in the same direction.

¶ 5. When the deputy arrived at the scene, emergency medical personnel were present and the deputy learned from them that the passenger on the motorcycle had been severely injured in the crash.[2] Padley told the deputy that, just before the crash, she missed a turn while driving on the highway and used a driveway to attempt to execute a U-turn. When she was about halfway through the attempted U-turn, the motorcycle struck the driver's side of her vehicle.

¶ 6. Regarding the crash scene after the collision, the deputy first testified that he observed Padley's vehicle in the "middle" of the two-lane highway. On cross-examination, however, after being shown a photograph of the scene of the accident, the deputy testified that he was "not disputing" that Padley's vehicle was

---

[2] The motorcycle passenger later died from injuries she sustained in the crash. Padley does not argue that the deputy's testimony regarding the passenger's injuries was insufficient to establish that, at the time the deputy interacted with Padley following the crash, the passenger had suffered "great bodily harm" as a result of the crash, as required under Wis. Stat. § 343.305(3)(ar)2.

555

entirely in the lane of traffic into which she had made the U-turn. The deputy also testified that the motorcycle came to rest partially in each lane. The deputy observed skid marks apparently left by the motorcycle, starting in the lane in which both the motorcyclist and Padley had originally been driving and traveling into the opposite lane, into which Padley turned.

¶ 7. The deputy testified that attempting a U-turn at that location on the highway would not necessarily constitute a traffic violation, but that it would be a violation if it interfered with other traffic. The deputy concluded, while on the scene, that Padley's attempted U-turn had interfered with the progress of the motorcycle.

¶ 8. After interviewing Padley at the crash scene, the deputy asked her to perform field sobriety tests, which she did. The deputy observed no signs of impairment. The deputy then requested that Padley accompany him to the Sheriff's Department for a blood draw pursuant to WIS. STAT. § 343.305(3)(ar)2., which as referenced above became part of the implied consent law effective in 2010.

¶ 9. This statute provides that a law enforcement officer is authorized to request that a person submit to a blood draw, using an "Informing the Accused" form using language taken from WIS. STAT. § 343.305(4), when that person "is the operator of a vehicle that is involved in an accident that causes the death of or great bodily harm to any person and the law enforcement officer has reason to believe that [the operator of the vehicle] violated any state or local traffic law."[3] Sec. 343.305(3)(ar)2.

───────────────

[3] As amended by 2009 Wisconsin Act 163, this section of the statute now reads:

¶ 10. Padley voluntarily accompanied the deputy to the Sheriff's Department, where the deputy read to Padley the "Informing the Accused" form. Using this form, which incorporated language from Wis. Stat. § 343.305(3)(ar)2., the deputy advised Padley in pertinent part as follows:

> [Y]ou are the operator of a vehicle that was involved in an accident that caused the death of, great bodily harm to, or substantial bodily harm to a person, . . .
>
> This law enforcement agency now wants to test one or more samples of your breath, blood or urine to determine the concentration of alcohol or drugs in your system. If any test shows more alcohol in your system than the law permits while driving, your operating privilege will be suspended. If you refuse to take any test that this agency requests, your operating privilege will be revoked and you will be subject to other penalties. The test results or the fact that you refused testing can be used against you in court.
>
> If you take all the requested tests, you may choose to take further tests.
>
> . . . .

If a person is the operator of a vehicle that is involved in an accident that causes the death of or great bodily harm to any person and the law enforcement officer has reason to believe that the person violated any state or local traffic law, the officer may request the operator to provide one or more samples of his or her breath, blood, or urine for the purpose specified under sub. (2). Compliance with a request for one type of sample does not bar a subsequent request for a different type of sample. A person who is unconscious or otherwise not capable of withdrawing consent is presumed not to have withdrawn consent under this subdivision and one or more samples specified in par. (a) or (am) may be administered to the person. If a person refuses to take a test under this subdivision, he or she may be arrested under par. (a).

Wis. Stat. § 343.305(3)(ar)2.

In addition, your operating privileges will also be suspended if a detectable amount of a restricted controlled substance is in your blood.[4]

At no point was Padley placed under arrest.

¶ 11. There is no dispute that Padley indicated to the deputy her consent to a blood draw after the deputy read the "Informing the Accused" form to her. However, the parties stipulated in the circuit court that, had the deputy "simply asked her to consent to" a blood draw without reading the "Informing the Accused" form to her, "she would have declined such a draw."

¶ 12. Padley filed a motion to suppress the results of the blood test on the grounds that it was the product of a search that was unreasonable under the Fourth Amendment, and a separate motion to suppress on the grounds that WIS. STAT. § 343.305(3)(ar)2. is unconstitutional. In these motions, Padley argued that the blood draw constituted an unreasonable search because it

---

[4] The form that the deputy read to Padley tracks language required by WIS. STAT. § 343.305(4). Although Padley does not refer to it, we note an apparent omission in the terms of § 343.305(4), and thus an apparent omission from the deputy's advisement to Padley. The advisement does not inform the driver that the law enforcement officer requesting the search has reason to believe that the driver subject to the search has violated a traffic law, even though, as summarized above in Footnote 3, § 343.305(3)(ar)2. explicitly contemplates *both* that (1) the driver of the vehicle was involved in an accident that caused death of or great bodily harm *and* (2) the officer has reason to believe that the driver violated a state or local traffic law. Reading §§ 343.305(4) and 343.305(3)(ar)2. together, it appears that the intent of the legislature was that police inform a driver that he or she is being asked to submit to a search because both of the two factors are present. However, neither party refers to this apparent omission on appeal. We express no opinion as to whether Padley could have successfully challenged her consent to the blood draw as invalid on this basis.

was not based on probable cause to believe that the search would produce evidence of a crime and there were no exigent circumstances. As to Padley's consent, she first argued that she "did not give consent for the blood draw," but subsequently argued that her consent was not "informed or voluntary." Padley also argued that the deputy "had no reasonable basis to believe that [Padley] had violated any state or local traffic law," and, thus, the search was not justified under § 343.305(3)(ar)2.

¶ 13. The circuit court denied Padley's motions, concluding that WIS. STAT. § 343.305(3)(ar)2. is constitutional and that Padley had voluntarily consented to the search. Regarding the alleged traffic law violation, the circuit court credited the facts as the deputy had testified to them. From these facts, the circuit court concluded that the deputy had "reason to believe" that Padley had violated WIS. STAT. § 346.33(1m) by attempting a U-turn that "interfer[ed] with other traffic," namely, the progress of the motorcycle.

¶ 14. After the circuit court denied her motions, Padley pled guilty to charges of homicide by negligent operation of a vehicle and operating with a restricted controlled substance and causing injury. She now appeals the denial of her suppression motions.

## STANDARDS OF REVIEW

██

¶ 15. We review a motion to suppress under a two step analysis. *State v. Robinson*, 2009 WI App 97, ¶ 9, 320 Wis. 2d 689, 770 N.W.2d 721. We will uphold the circuit court's findings of historical fact unless those findings are clearly erroneous, but the application of constitutional principles to the facts found presents a

question of law that we review de novo. *Id.* Evidence that is obtained pursuant to an unlawful search will be suppressed, subject to exceptions that the State does not argue are applicable here. *See State v. Dearborn*, 2010 WI 84, ¶¶ 15–16, 30–49, 327 Wis. 2d 252, 786 N.W.2d 97.

¶ 16. The constitutionality of a statute presents a question of law that we review de novo. *State v. Cole*, 2003 WI 112, ¶ 10, 264 Wis. 2d 520, 665 N.W.2d 328. We start with a presumption that a challenged statute is constitutional, and a challenger must prove that it is unconstitutional beyond a reasonable doubt. *Id.*, ¶ 11. Thus, we are to " 'indulge[] every presumption to sustain the law if at all possible, and if any doubt exists about a statute's constitutionality, we must resolve that doubt in favor of constitutionality.' " *Id.* (quoted source omitted). Further, a facial challenge to the constitutionality of a statute cannot prevail unless that statute cannot be enforced " 'under any circumstances.' " *State v. Wood*, 2010 WI 17, ¶ 13, 323 Wis. 2d 321, 780 N.W.2d 63 (quoted source omitted).

¶ 17. Finally, as to the circuit court's determination that the deputy had the requisite "reason to believe" that Padley committed a traffic violation, we will uphold a circuit court's factual determinations unless they are clearly erroneous, but the interpretation of a statute and the application of facts to a particular statutory standard are questions of law we decide independently from the circuit court. *See County of Jefferson v. Renz*, 231 Wis. 2d 293, 301, 316, 603 N.W.2d 541 (1999).

## DISCUSSION

¶ 18. Some of Padley's arguments are unclear. As best we understand them, the crux of each relates to whether the consent she gave to the blood draw was

valid. If not, the search was not conducted pursuant to the only lawful exception to the warrant requirement that could exist here, valid consent. However, Padley acknowledges, as she must under law we summarize below, that valid consent would have constituted an exception to the warrant requirement under the Fourth Amendment. Padley argues that, for three reasons, her consent was not valid and, thus, the search was not lawful.

¶ 19. First, Padley argues that her consent was not valid because the statute on which the deputy relied to obtain it, Wis. Stat. § 343.305(3)(ar)2., is unconstitutional.

¶ 20. Second, Padley argues that her consent was not voluntary and, thus, was invalid, because the deputy provided her with "false information" or a "false threat" when he relied on Wis. Stat. § 343.305(3)(ar)2. to request her consent.

¶ 21. Third, Padley argues that her consent was not valid because, at the time the deputy read to her from the "Informing the Accused" form, the deputy lacked the level of incriminating information necessary to trigger the deputy's reliance on Wis. Stat. § 343.305(3)(ar)2. Specifically, Padley contends that the deputy lacked the requisite "reason to believe" that Padley had committed a traffic law violation, as required by § 343.305(3)(ar)2.[5]

[5] Padley frames her argument challenging "reason to believe" that she committed a traffic violation as being an "as applied" constitutional challenge to Wis. Stat. § 343.305(3)(ar)2. We do not understand the substance of this particular argument to be that § 343.305(3)(ar)2. was not constitutionally applied to her. Instead, the substance of this argument is that a statutory requirement was not met and, therefore, the statute did not authorize the deputy to force Padley to decide between giving

¶ 22. For the following reasons, we reject each of Padley's arguments. Before addressing Padley's specific arguments, we explain the relevant law regarding Fourth Amendment constraints on unreasonable searches and Wisconsin's implied consent law scheme.

## I. The Fourth Amendment and Implied Consent

### a. The Fourth Amendment in the Blood Draw Context

¶ 23. A blood draw conducted at the direction of the police is a search subject to the Fourth Amendment requirement that all searches must be reasonable.[6] *Schmerber v. California*, 384 U.S. 757, 767 (1966). Warrantless searches are per se unreasonable and therefore unlawful, subject to a few " 'well-delineated' " exceptions. *State v. Williams*, 2002 WI 94, ¶ 18, 255 Wis. 2d 1, 646 N.W.2d 834 (quoted source omitted). As relevant to the State's extraction of blood, the following

consent to a blood draw and implied consent law sanctions. As she argues at one point, the "facts known to the deputy [did] not support 'reason to believe' that Padley violated a traffic rule."

[6] Because the language of the Fourth Amendment and article I section II of the Wisconsin Constitution is substantially similar, Wisconsin courts follow the United States Supreme Court's interpretation of the Fourth Amendment when construing article I section II of the state constitution. *See State v. Richardson*, 156 Wis. 2d 128, 137, 456 N.W.2d 830 (1990). Thus, for the balance of this opinion we analyze Padley's arguments as presenting Fourth Amendment issues, relying on United States Supreme Court precedent, in addition to precedent of our supreme court and this court. *See State v. Felix*, 2012 WI 36, ¶ 38, 339 Wis. 2d 670, 811 N.W.2d 775.

are exceptions to the warrant requirement,[7] the first of which is the primary focus of this appeal:

> *(1) Consent.* A search conducted pursuant to free and voluntary consent from the person searched. *Id.*

> *(2) Incident to arrest.* A search incident to a lawful arrest, if there is reasonable suspicion that the search will produce evidence of a crime and exigent circumstances exist. *See Schmerber*, 384 U.S. at 769–71; *State v. Seibel*, 163 Wis. 2d 164, 179, 471 N.W.2d 226 (1991).

> *(3) Probable cause.* Without a lawful arrest, a search based on probable cause that evidence will be found, where exigent circumstances exist. *See State v. Erickson*, 2003 WI App 43, ¶¶ 7–12, 260 Wis. 2d 279, 659 N.W.2d 407; *State v. Bentley*, 92 Wis. 2d 860, 864–65, 286 N.W.2d 153.

### b. Implied Consent

■■

¶ 24. Wisconsin's implied consent law is intended to facilitate the ability of police to secure evidence of intoxication or controlled substances by persuading drivers to consent to a requested chemical test by attaching a penalty for refusal to do so. *See State v. Zielke*, 137 Wis. 2d 39, 46, 403 N.W.2d 427 (1987) (legislative intent "to facilitate the gathering of evidence against drunk drivers"); *State v. Marshall*, 2002 WI App 73, ¶ 13, 251 Wis. 2d 408, 642 N.W.2d 571 ("[T]he implied consent statute provides an incentive for voluntary chemical testing, i.e., not facing civil

---

[7] In addition to the other requirements we summarize, the Fourth Amendment requires that blood draws be conducted in a reasonable manner. *See Schmerber v. California*, 384 U.S. 757, 771–72 (1966). Padley does not argue that her blood was drawn in an unreasonable manner.

refusal procedures and automatic revocation . . . ."); *see also Missouri v. McNeely*, 133 S. Ct. 1552, 1566–67 (2013) (implied consent laws among the "broad range of legal tools" used by states "to enforce their drunk-driving laws and to secure [blood alcohol content] evidence"). As pertinent here, Wisconsin's implied consent law provides that:

> Any person who . . . drives . . . a motor vehicle upon the public highways of this state . . . is deemed to have given consent to one or more tests of his or her breath, blood or urine, for the purpose of determining the presence or quantity in his or her blood or breath, of alcohol, controlled substances, . . . when requested to do so by a law enforcement officer under sub. (3)(a) or (am) or when required to do so under sub. (3)(ar) or (b).

WIS. STAT. § 343.305(2).

¶ 25. We start with a general observation before moving to more specific discussion. "Implied consent" is not an intuitive or plainly descriptive term with respect to how the implied consent law works. We suspect that it is a source of confusion. On occasion in the past we have seen the term "implied consent" used inappropriately to refer to the consent a driver gives to a blood draw at the time a law enforcement officer requires that driver to decide whether to give consent. However, actual consent to a blood draw is not "implied consent," but rather a possible result of requiring the driver to choose whether to consent under the implied consent law.

¶ 26. There are two consent issues in play when an officer relies on the implied consent law. The first begins with the "implied consent" to a blood draw that all persons accept as a condition of being licensed to drive a vehicle on Wisconsin public road ways. The existence of this "implied consent" does not mean that

police may require a driver to submit to a blood draw. Rather, it means that, in situations specified by the legislature, if a driver chooses not to consent to a blood draw (effectively declining to comply with the implied consent law), the driver may be penalized. This penalty scenario for "refusals" created by the implied consent law sets the scene for the second consent issue.

¶ 27. The State's power to penalize a refusal via the implied consent law, under circumstances specified by the legislature, gives law enforcement the right to force a driver to make what is for many drivers a difficult choice. The officer offers the following choices: (1) give consent to the blood draw, or (2) refuse the request for a blood draw and suffer the penalty specified in the implied consent law. When this choice is offered under statutorily specified circumstances that pass constitutional muster, choosing the first option is voluntary consent. The fact that the driver is forced to make a difficult choice does not render the consent involuntary. "The criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow." *McGautha v. California*, 402 U.S. 183, 213 (1971) (quoting *McMann v. Richardson*, 397 U.S. 759, 769 (1970)), *vacated on other grounds by Crampton v. Ohio*, 408 U.S. 941 (1972).

¶ 28. With the general understanding that a proper implied consent law authorizes law enforcement to present drivers with a difficult, but permissible, choice between consent or penalties for violating the implied consent law, we resume more specific discussion.

¶ 29. With some exceptions, before 2009 Wisconsin Act 163, law enforcement officers were authorized to invoke the consent implied in WIS. STAT. § 343.305(2)

by requesting that a driver submit to a test only after the driver had been arrested for an OWI-related violation. *See* Wis. Stat. § 343.305(3)(a) (2003–04).[8] However, this case involves a request made of a new category of driver, one of two new categories created by 2009 Wisconsin Act 163. Pursuant to these two new categories, the second of which is at issue here, a law enforcement officer may request that a driver submit to a blood draw:

- If the driver "is the operator of a vehicle that is involved in an accident that causes substantial bodily harm . . . to any person, and a law enforcement officer detects any presence of alcohol, [or] a controlled substance . . . ."

- If the driver "is the operator of a vehicle that is involved in an accident that causes the death of or great bodily harm to any person and the law enforcement officer has reason to believe that the person violated any state or local traffic law . . . ."

*See* 2009 Wisconsin Act 163; *see also* § 343.305(3)(ar)1. and 2. Unlike the pre-existing category, a driver falling within either of these new categories need not be arrested for an OWI-related violation.

¶ 30. It remains the case under the new law that, when an officer requests that a driver submit to a test pursuant to Wis. Stat. § 343.305(3)(a) or (ar), the officer

---

[8] The 2005–06 version of the implied consent law provided that an officer could request submission to a test of a person who "is the operator of a vehicle that is involved in an accident that causes the death of or great bodily harm to any person, and a law enforcement officer detects any presence of alcohol, [or] a controlled substance." Wis. Stat. § 343.305(3)(ar) (2005–06). This section was amended by 2009 Wisconsin Act 163, described above, and is not at issue in this appeal.

is statutorily required to read to the driver a corresponding "Informing the Accused" form. *See* § 343.305(4).

¶ 31. It also remains the case that the implied consent law "creates a separate offense that is triggered upon a driver's refusal to submit to a chemical test." *State v. Zielke*, 137 Wis. 2d at 41.[9] This separate offense is the basis for requiring the driver to choose between giving consent to the blood draw or being penalized for the separate offense. As the "Informing the Accused" form explains, a driver who refuses to submit to a test when requested to do so is penalized for the refusal with consequences that include automatic license revocation. WIS. STAT. § 343.305(4). Revocation of the license is automatic, in the sense that revocation may be overturned only if the driver prevails before a court at a refusal hearing requested by the driver within ten days of receipt of the notice of intent to revoke his or her license. *See* § 343.305(9), (10).

## II. Constitutionality of WIS. STAT. § 343.305(3)(ar)2.

¶ 32. Padley's argument that WIS. STAT. § 343.305(3)(ar)2. is unconstitutional begins with the broad assertion that, both "generally" and "on the specific facts here," § 343.305(3)(ar)2. "creates an impermissible categorical exception to the Fourth Amendment when it authorizes police to take an evidentiary blood sample without suspicion that the blood will

---

[9] We are mindful that some opinions we cite, such as *State v. Zielke*, 137 Wis. 2d 39, 403 N.W.2d 427 (1987), predate the 2009 amendments. However, these cases remain good law to the extent that they interpret aspects of the implied consent law that survived the 2009 amendments. We will not repeat this point each time we reference pre-2009 Wisconsin Act 163 precedent.

contain evidence of a crime—and in the absence of either a warrant or exigent circumstances."

¶ 33. Before turning to the specifics of Padley's constitutional challenges, we note from the start that this formulation mischaracterizes a critical aspect of WIS. STAT. § 343.305(3)(ar)2. With exceptions not pertinent to this appeal, the statute does not authorize police "to take an evidentiary blood sample." As we have explained, it authorizes police to require drivers to choose between consenting to a blood draw or, instead, refusing to give consent and being penalized for the refusal. As we discuss shortly, Padley's mischaracterization of the authorization granted in § 343.305(3)(ar)2. is pervasive in her briefing and vitiates most of her arguments regarding the constitutionality of the statute.

¶ 34. Turning back to Padley's constitutional challenges, by using the term "generally," and from other references Padley makes, we take her to be arguing, in part, that WIS. STAT. § 343.305(3)(ar)2. is facially unconstitutional. By using the phrase "on the specific facts here," and from other references, Padley may intend to argue that it is unconstitutional as applied to her. However, Padley does not properly frame any of her constitutional arguments as as-applied challenges, and she does not explain why § 343.305(3)(ar)2. is unconstitutional based on the facts of this particular case, as opposed to being unconstitutional in any circumstance under which the law may be applied.

¶ 35. Failure to clearly distinguish between facial as opposed to as-applied constitutional challenges risks confusion. While the underlying substantive rights do not change, the challenges are quite different:

> A party may challenge a law . . . as being *unconstitutional on its face.* Under such a challenge, the challenger must show that the law cannot be enforced "under any circumstances." If a challenger succeeds in a facial attack on a law, the law is void "from its beginning to the end." *In contrast, in an as-applied challenge,* we assess the merits of the challenge by considering the facts of the particular case in front of us, "not hypothetical facts in other situations." Under such a challenge, the challenger must show that his or her constitutional rights were actually violated. If a challenger successfully shows that such a violation occurred, the operation of the law is void as to the party asserting the claim.

*Wood,* 323 Wis. 2d 321, ¶ 13 (emphasis added) (citations and quoted sources omitted). Because Padley does not present a clear argument as to why WIS. STAT. § 343.305(3)(ar)2. is unconstitutional as applied to her, we construe her to raise only facial constitutional challenges to this statute.

¶ 36. Padley argues that WIS. STAT. § 343.305(3)(ar)2. is facially unconstitutional because it: (1) authorizes unreasonable searches in violation of the Fourth Amendment; (2) violates equal protection; and (3) violates due process because it is vague. Each of these three arguments is at least implicitly premised on the notion, which we do not question, that if § 343.305(3)(ar)2. is facially unconstitutional, then Padley's consent for the blood draw was not valid and the test results must be suppressed, because the parties stipulated that she consented only because the deputy read the "Informing the Accused" form to her. The State does not present a developed legal argument to the contrary.

¶ 37. Before addressing these facial constitutional challenges, we address some confusion in the argu-

ments of the parties regarding the implied consent law. Both parties on appeal make arguments that rest on inaccurate views of the law. These include Padley's incorrect view, which we previewed above and which we conclude is fatal to most of her constitutional arguments, that WIS. STAT. § 343.305(3)(ar)2. authorizes police to compel blood draws. They also include the State's incorrect view that "[i]mplied consent . . . is still consent," meaning that, in a case such as this, "implied consent" alone can "serve as a valid exception to the warrant requirement." These incorrect views are two sides of the same coin, in that they share a misunderstanding of what "implied consent" means under the implied consent law, and the difference between giving implied and actual consent.

¶ 38. It is incorrect to say that a driver who consents to a blood draw after receiving the advisement contained in the "Informing the Accused" form has given "implied consent." If a driver consents under that circumstance, that consent is actual consent, not implied consent. If the driver refuses to consent, he or she thereby withdraws "implied consent" and accepts the consequences of that choice. *See, e.g., McNeely*, 133 S. Ct. at 1566 (Implied consent laws "impose significant consequences when a motorist withdraws consent."); *State v. Neitzel*, 95 Wis. 2d 191, 203, 289 N.W.2d 828 (1980) ("The entire tenor of the implied consent law [WIS. STAT. § 343.305 (1975)] is . . . that consent has already been given [at the time a person obtains a license] and cannot be withdrawn without the imposition of the legislatively imposed sanction of mandatory suspension."); *see also State v. Krajewski*, 2002 WI 97, ¶ 25, 255 Wis. 2d 98, 648 N.W.2d 385 (explaining that a

driver can "withdraw[]" consent" by "refus[ing] to provide a requested sample for testing").

¶ 39. We need not resolve in this appeal potential implications that may arise from this withdrawal-of-consent concept in other contexts. What is important for current purposes is that, at least in cases of the type we now address, the implied consent law is explicitly designed to allow the driver, and not the police officer, to make the choice as to whether the driver will give or decline to give *actual* consent to a blood draw when put to the choice between consent or automatic sanctions. Framed in the terms of "implied consent," choosing the "yes" option affirms the driver's implied consent and constitutes actual consent for the blood draw. Choosing the "no" option acts to withdraw the driver's implied consent and establishes that the driver does not give actual consent. Withdrawing consent by choosing the "no" option is an unlawful action, in that it is penalized by "refusal violation" sanctions, even though it is a choice the driver can make.[10]

---

[10] We acknowledge that there may be tension between the case law we summarize here and language in the implied consent law as amended by 2009 Wisconsin Act 163, which establishes that, at least in the context of incapacitated drivers, "implied consent" is a sufficient basis on which to proceed with a warrantless search. *See* Wis. Stat. § 343.305(3)(ar)2. Under § 343.305(3)(ar)2., a driver involved in an accident resulting in a death or great bodily harm who police believe committed a traffic law violation, and who is "unconscious or otherwise not capable of withdrawing consent[,] is presumed not to have withdrawn consent" and a blood draw "may be administered" to the driver. Thus, at least in the context of an incapacitated driver and in the limited context of § 343.305(3)(ar)2., implied consent is deemed the functional equivalent of actual consent. However, we need not address this tension further because, in the instant case, Padley has not called any court's attention to the incapacitated driver scenario and there is no question that

¶ 40. Bearing this background in mind, we view most of Padley's constitutional arguments as flawed because they rest on the misunderstanding that, as Padley now puts it, by operation of WIS. STAT. § 343.305(3)(ar)2., "upon a minimal finding that someone was seriously injured and the driver may have violated a traffic rule, a sample of blood may be taken from [the driver]." As we have explained, the flaw here is that, in this context, § 343.305(3)(ar)2. does not authorize searches, instead it authorizes police to require drivers to choose between giving actual consent to a blood draw, or withdrawing "implied consent" and suffering implied-consent-law sanctions.

¶ 41. With these distinctions in mind, we now address the specific arguments that Padley makes.

### a. *Reasonableness of Searches*

¶ 42. Padley argues that WIS. STAT. § 343.305(3)(ar)2. is facially unconstitutional because, in all circumstances to which it applies, it requires drivers to submit to searches that violate the reasonableness requirement of the Fourth Amendment. More specifically, Padley argues that § 343.305(3)(ar)2. is unconstitutional because it "authorizes police to take an evidentiary blood sample without suspicion that the blood will contain evidence of a crime [] and in the absence of either a warrant or exigent circumstances." This argument fails because, as explained above,

---

Padley was treated by the deputy as a conscious driver who could give actual consent. Having acknowledged this tension, we will not reference the incapacitated driver aspect of § 343.305(3)(ar)2. in this opinion each time that it could represent an exception to our analysis.

§ 343.305(3)(ar)2. does not authorize searches, it authorizes law enforcement to require a driver to choose between giving actual consent to a blood draw, or withdrawing "implied consent" and suffering implied-consent-law sanctions.

¶ 43. For this same reason, we reject Padley's suggestion in supplemental briefing ordered by this court that we should follow the reasoning of other state courts that have held unconstitutional the particular implied consent laws of their jurisdictions based on the same reasoning that Padley now advances.[11] Based on our review of these opinions, it appears that either the facts, the implied consent laws of the other states, or both, differ in significant respects from the facts and the implied consent law before us. Padley does not acknowledge and account for these significant differences.

¶ 44. Of particular note, in many of these opinions from other states, the courts interpreted the implied consent laws at issue not to authorize a choice, but rather to *require* drivers to submit to blood draws based solely on the circumstances that the drivers had been involved in accidents that resulted in fatalities or serious injuries. *See, e.g., Cooper v. State*, 587 S.E.2d 605, 612 (Ga. 2003) (implied consent law is unconstitutional "to the extent that [it] *requires* chemical testing" in instances of fatal or serious injury accidents without

---

[11] In making this argument, Padley cites to: *State v. Blank*, 90 P.3d 156 (Alaska 2004); *State v. Quinn*, 178 P.3d 1190 (Ariz. Ct. App. 2008); *Cooper v. State*, 587 S.E.2d 605 (Ga. 2003); *King v. Ryan*, 607 N.E.2d 154 (Ill. 1992); *State v. Declerk*, 317 P.3d 794 (Kan. Ct. App. 2014); *State v. Roche*, 681 A.2d 472 (Me. 1996); *McDuff v. State*, 763 So.2d 850 (Miss. 2000); *Commonwealth v. Kohl*, 615 A.2d 308 (Pa. 1992); *but see Hannoy v. State*, 789 N.E.2d 977, 986–87 (Ind. App. 2003).

probable cause of impairment) (emphasis added); *State v. Declerk*, 317 P.3d 794, 802 (Kan. Ct. App. 2014) (implied consent law providing that fatal accident or serious injury plus traffic infraction constitutes probable cause was unconstitutional "to the extent it *requires* a search and seizure absent probable cause the person was operating . . . a vehicle under the influence") (emphasis added); *McDuff v. State*, 763 So.2d 850, 853–55 (Miss. 2000) (statute providing that "[t]he operator of any motor vehicle involved in an accident that results in death *shall* be tested" is unconstitutional because it "requires search and seizure absent probable cause") (emphasis added). Padley's argument seems to be premised on the inaccurate view that Wisconsin's implied consent law mirrors the laws of these other states. This is inaccurate because, again, Wis. Stat. § 343.305(3)(ar)2. does not require a driver to submit to a search.

¶ 45. Padley attempts to support her argument—that Wis. Stat. § 343.305(3)(ar)2. is unconstitutional because it authorizes law enforcement to compel a search—by citing to *Schmerber* and *McNeely*, and by pointing to the fact that these opinions examine the reasonableness of warrantless blood draws. However, Padley does not explain how these opinions support her assertion that § 343.305(3)(ar)2. compels a search and is, therefore, facially unconstitutional.

¶ 46. In *Schmerber*, the Supreme Court held that a warrantless, nonconsensual blood draw, over the driver's objection, was reasonable under the Fourth Amendment because the driver had been lawfully arrested for driving while intoxicated, there was a clear indication that evidence of intoxication would be found from the blood draw, and the arresting officer was confronted with exigent circumstances. 384 U.S. at 759,

767–72. Interpreting *Schmerber*, the court in *McNeely* concluded that the fact that intoxicants metabolize in the driver's bloodstream does not constitute a per se exigency that justifies an exception to the Fourth Amendment's warrant requirement, but is only one factor to be weighed in the analysis. *See McNeely*, 133 S. Ct. at 1556.

¶ 47. Neither *Schmerber* nor *McNeely* is a consent case. *See McNeely*, 133 S. Ct. at 1557 (after having been read a standard implied consent form, the driver refused to consent to the requested search, and the search was conducted over this refusal); *Schmerber*, 384 U.S. at 759 (blood drawn "despite [the driver's] refusal . . . to consent to the test"). Although these cases would inform a discussion regarding whether the deputy could have compelled Padley to submit to a blood draw after she declined to give consent, the opinions say nothing about the constitutionality of a statute that authorizes a law enforcement officer to require a driver to make a choice about consent.

¶ 48. For these reasons, Padley fails to demonstrate that Wis. Stat. § 343.305(3)(ar)2. is facially unconstitutional because it authorizes law enforcement to compel an unreasonable search.

### b. *Equal Protection*

¶ 49. Padley argues that Wis. Stat. § 343.305(3)(ar)2. is unconstitutional on its face because it denies equal protection of the laws to one class of drivers. Padley states the issue as follows: the Fourth Amendment is in all cases "abrogated" through operation of § 343.305(3)(ar)2., because "consent is deemed given to . . . take an evidentiary blood sample

from the driver" without requiring proof of a "connection between the act under investigation, the traffic violation and the possibility of evidence being recovered from the driver's blood." As best we can determine, this is an argument that § 343.305(3)(ar)2. deprives one class of drivers—those who have been involved in crashes involving serious injuries and who law enforcement have reason to believe have committed traffic violations—of their Fourth Amendment rights without being narrowly tailored to avoid violating those rights. We can be brief in summarizing the applicable legal standards and addressing this argument, because the argument is based on the same premise we have rejected above, namely, that police may use § 343.305(3)(ar)2. to compel blood draws, as opposed to using it only to present a choice to the suspect.

¶ 50. Equal protection is guaranteed by article I, section 1 of the Wisconsin Constitution, and the Fourteenth Amendment to the United States Constitution. The equal protection clause " 'is designed to assure that those who are similarly situated will be treated similarly,' " and, thus, " 'requires that the legislature have reasonable and practical grounds for the classifications that it draws.' " *State v. Smith*, 2010 WI 16, ¶ 15, 323 Wis. 2d 377, 780 N.W.2d 90 (quoted sources omitted).

¶ 51. "[T]he threshold question is whether a fundamental right is implicated or whether a suspect class is disadvantaged by the challenged legislation. If either is the case, the challenged legislation must survive strict scrutiny." *Id.*, ¶ 12. In this context, "strict scrutiny requires that the statute must be the least restrictive way of achieving a compelling governmental interest." *State v. Martin*, 191 Wis. 2d 646, 654, 530 N.W.2d

420 (Ct. App. 1995). If neither a fundamental right nor a suspect class is implicated, the statute is subject to the far more deferential "rational basis review" and " 'must be sustained unless it is "patently arbitrary" and bears no rational relationship to a legitimate government interest.' " *Smith*, 323 Wis. 2d 377, ¶ 12 (quoted sources omitted).

¶ 52. Padley argues that strict scrutiny is required here because drivers have "the right to be free from intrusion of the body that is compelled by the government." In support of this position she cites *McNeely*, in which the Court opined that "any compelled intrusion into the human body implicates significant, constitutionally protected privacy interests." 133 S. Ct. at 1565. However, as we now explain, Padley purports to identify as an equal protection violation a feature of Wis. Stat. § 343.305(3)(ar)2. that does not exist, and therefore she has not raised an equal protection argument. For this reason, we need not address the level of scrutiny or proceed further with equal protection analysis.

¶ 53. It is not true, as Padley contends again in this context, that under Wis. Stat. § 343.305(3)(ar)2., *actual* "consent is deemed given to take an evidentiary blood sample from the driver." Put differently, § 343.305(3)(ar)2. does not implicate the right to be free from unreasonable searches in the manner that Padley suggests because it does not permit a law enforcement officer to compel a search of any driver, let alone does the statute compel some classes of drivers and not others to submit to a search. For all classes of drivers covered by the implied consent law, as pertinent to this appeal, any search conducted must be based on a warrant, actual consent, or another exception to the warrant requirement.

577

¶ 54. Because Padley argues from the false premise that WIS. STAT. § 343.305(3)(ar)2. *requires* drivers to submit to a blood draw, and therefore *requires* drivers to "surrender" their Fourth Amendment rights, she fails to raise an argument that § 343.305(3)(ar)2. is facially unconstitutional on equal protection grounds.

### c. *Vagueness*

██

¶ 55. Padley argues that WIS. STAT. § 343.305(3)(ar)2. is facially unconstitutional because the statute is "impermissibly vague." According to Padley, this is so because § 343.305(3)(ar)2. does not require proof "that the traffic violation bears any relation to either the cause of the crash or the probability that evidence of impairment would be found in the driver's blood." Padley argues that a violation so minor and unlikely to cause an accident as a "malfunctioning license plate light can now give police the ability to take an evidentiary blood sample." We conclude that Padley is not in a position to raise a vagueness challenge.

██ ██

¶ 56. "The concept of vagueness rests on the constitutional principle that procedural due process requires fair notice and proper standards for adjudication." *State ex rel. Hennekens v. City of River Falls Police & Fire Comm'n*, 124 Wis. 2d 413, 420, 369 N.W.2d 670 (1985). A challenge to a statute based on vagueness is subject to a two-prong test:

> The first prong of the vagueness test is concerned with whether the statute sufficiently warns persons "wishing to obey the law that [their] . . . conduct comes near the proscribed area." The second prong is con-

cerned with whether those who must enforce and apply the law may do so without creating or applying their own standards.

*Larson v. Burmaster,* 2006 WI App 142, ¶ 29, 295 Wis. 2d 333, 720 N.W.2d 134 (alterations in original) (citation omitted).

¶ 57. Significantly for this appeal, if the particular conduct of the defendant "plainly falls within the prohibition of the statute, the defendant may not base a constitutional vagueness challenge on hypothetical facts, unless a First Amendment right is at issue." *See State v. Smith,* 215 Wis. 2d 84, 91, 572 N.W.2d 496 (Ct. App. 1997).

¶ 58. Padley's vagueness argument is not well developed. She cites the standard for vagueness, but then does not explain how Wis. Stat. § 343.305(3)(ar)2. fails to "provide fair notice and proper standards for adjudication." Padley merely asserts that the statute does not require a causal link between the suspected traffic violation and the injury-causing accident, notes that it does not require a causal link between the suspected traffic violation and evidence of impairment, and argues that, therefore, the statute is vague. We need not address undeveloped arguments and, thus, we could reject Padley's vagueness argument on these grounds. *See State v. Pettit,* 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992).

¶ 59. However, we resolve this issue on a different basis. Padley cannot make a constitutional vagueness challenge to Wis. Stat. § 343.305(3)(ar)2. based on hypothetical facts because her conduct "plainly falls within the prohibition of" § 343.305(3)(ar)2., even under her own proposed interpretations of the statute,

and she does not contend that a First Amendment right is at issue. *See Smith,* 215 Wis. 2d at 91. That is, assuming without deciding only for the purposes of resolving this appeal that Padley is correct in asserting that § 343.305(3)(ar)2. is defective because it does not require a causal connection between the traffic violation and the injury-causing accident, she cannot make a vagueness challenge on that ground because we conclude that the traffic violation at issue here was a contributing factor to the injury-causing accident. As we explain in a separate section below, we are persuaded that the deputy had "reason to believe" that Padley attempted an illegal U-turn. And, the record amply supports a conclusion that the illegal maneuver contributed to the crash. Indeed, Padley does not suggest that, even if her attempted U-turn was a traffic violation, it was not a contributing factor to the crash. Thus, Padley fails to support her constitutional challenge because her conduct plainly falls within the reach of the statute even under her interpretation of its terms, based on an evident nexus between a traffic violation that Padley committed and the crash that caused death or great bodily harm. Padley cannot challenge § 343.305(3)(ar)2. on vagueness grounds by posing a hypothetical in which, unlike in her case, the traffic violation bears no apparent relation to an injury-causing accident.

¶ 60. For these reasons, we reject Padley's argument that Wis. Stat. § 343.305(3)(ar)2. is facially unconstitutional because it is vague.

### III. *Voluntariness of Padley's Consent*

■■■

¶ 61. In addition to the facial challenges discussed and rejected above, Padley makes a constitutional ar-

gument that the consent she gave to the search was involuntary and, thus, invalid, because it was given based on "false information" or a "false threat." We understand her argument to run as follows. WIS. STAT. § 343.305(3)(ar)2. authorized the deputy to request, via the "Informing the Accused" form, that Padley submit to a blood draw. The "Informing the Accused" form contained information that was "false" (in one formulation, a "false threat") because it effectively stated, by attaching a penalty to a refusal, that a driver in her circumstances—a driver involved in a serious injury crash who violated a traffic law, but who had not shown signs of impairment—did not have a Fourth Amendment right to be free of unreasonable searches of her blood, even though she did have that right. Thus, Padley's consent to the blood draw was invalid because it was not given freely and voluntarily, but was instead coerced or induced by this "false threat." Because her consent was invalid, the search was unlawful. We conclude that Padley fails to demonstrate that the deputy presented her with false information or a false threat via the "Informing the Accused" form.

¶ 62. In order for consent to constitute a valid exception to the warrant requirement of the Fourth Amendment, it must be freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968); *State v. Phillips*, 218 Wis. 2d 180, 196, 577 N.W.2d 794 (1998) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). Consent is voluntary if it is given in the "absence of actual coercive, improper police practices designed to overcome the resistance of a defendant." *State v. Clappes*, 136 Wis. 2d 222, 245, 401 N.W.2d 759 (1987). Where police engage in "no actual coercion or improper police conduct," consent is volun-

tary. *Village of Little Chute v. Walitalo*, 2002 WI App 211, ¶ 11, 256 Wis. 2d 1032, 650 N.W.2d 891. However, as this court has explained, "[o]rderly submission to law enforcement officers who, in effect, incorrectly represent that they have the authority to search and seize property, is not knowing, intelligent and voluntary consent under the Fourth Amendment." *State v. Giebel*, 2006 WI App 239, ¶ 18, 297 Wis. 2d 446, 724 N.W.2d 402.

¶ 63. Courts use two steps in reviewing a determination of voluntariness of consent to a search: whether there was consent, and whether it was voluntarily given. *See Phillips*, 218 Wis. 2d at 196–97. As referenced above, Padley does not contest that she said "yes" in response to the deputy's request for consent to the blood draw. She focuses on the second step only, whether her consent was voluntary.

¶ 64. In making a determination regarding the voluntariness of consent, this court examines the totality of the circumstances, including the circumstances surrounding consent and the characteristics of the defendant. *State v. Arctic*, 2010 WI 83, ¶¶ 32–33, 327 Wis. 2d 392, 786 N.W.2d 430. The State "bears 'the burden of proving by clear and positive evidence the search was the result of a free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied.'" *State v. Johnson*, 177 Wis. 2d 224, 233, 501 N.W.2d 876 (Ct. App. 1993) (quoting *Gautreaux v. State*, 52 Wis. 2d 489, 492, 190 N.W.2d 542 (1971)); *accord Artic*, 327 Wis. 2d 392, ¶ 32.

¶ 65. We examine the circuit court's findings of fact under the clearly erroneous standard, but we review the application of those facts to constitutional standards de novo. *Giebel*, 297 Wis. 2d 446, ¶ 11.

¶ 66. Padley does not argue that any statement the deputy made to her via the "Informing the Accused" form was an inaccurate statement of the implied consent law.[12]

¶ 67. Instead, Padley's sole argument is that, in reciting the required language to her, the deputy inadvertently gave her "false information" in telling her that

---

[12] We now briefly describe, but do not resolve, an apparent disconnect between the terms of Wis. Stat. § 343.305(3)(ar)2. and the statutes governing refusal hearings. If Padley had refused to give her consent and timely sought a refusal hearing, the issues she could have raised at the hearing are limited and include: (1) "[w]hether the officer had probable cause to believe the [driver] was driving or operating a motor vehicle while under the influence of alcohol, [or] a controlled substance . . . ."; and (2) whether the driver was "lawfully placed under arrest" for an OWI-related violation. Sec. 343.305(9)(a)5.a. As should be clear from discussion above, a court at Padley's hypothetical refusal hearing could not have concluded that either of these two circumstances existed here.

We do not address this issue further for two reasons. First, Padley does not direct our attention to this apparent inconsistency in her briefing on appeal, and apparently failed to raise this argument in the circuit court. Second, at least our initial impression is that this disconnect represents an error in legislative drafting that does not contribute to any argument made by Padley. The drafting error would be an inadvertent failure to amend the refusal hearing references at the time the legislature enacted Wis. Stat. § 343.305(3)(ar)2. It seems obvious from many contextual clues, which we will not recite here, that the legislature intended to allow a driver at a refusal hearing the opportunity to challenge each element necessary for an officer to have requested that the driver submit to a blood draw. *See* § 343.305(9)(a)5. Under this view of legislative intent, a driver who refused to submit to a request for a blood draw made under § 343.305(3)(ar)2. might prevail at a refusal hearing by proving that the driver had not been involved in an accident causing death or great bodily harm or that the officer requesting the search had lacked reason to believe that the driver violated a traffic law.

she "would be punished if she exercised a constitutional right—to be free from a warrantless intrusion of her body." According to Padley, this information was false because the State did not have the lawful authority to penalize her by revoking her license based on her failure to give consent to a warrantless search, when the deputy lacked a specific basis to suspect impaired driving, "because the state may not attach an affirmative penalty or punishment to the mere exercise of a constitutional right." We are not persuaded.

¶ 68. Padley's consent argument is undermined by her response to our request for supplemental briefing of the parties. We asked the parties to address whether the legislature could enact a statute providing that law enforcement can revoke the operating privilege of a driver who is involved in an accident that causes the death of or great bodily harm to a person and law enforcement has a reason to believe the driver violated a traffic law.

¶ 69. Padley responds that such a statute would be constitutional, assuming that due process requirements are met, presumably entailing a meaningful opportunity to challenge the basis for revocation. Padley's response to our question seems to leave little room for the premise behind her consent argument, namely, that she was faced with an impermissible choice: consent to a blood draw or be impermissibly penalized for exercising her constitutional right to refuse. If, as Padley contends, it is constitutional for the legislature to provide for automatic revocation of a driver's operating privilege based on the driver's involvement in an accident resulting in death or great bodily harm and violation of a traffic law, the logical inference is that it would be constitutional for the legislature to allow a driver in this situation the ability

to *retain* his or her license by freely and voluntarily consenting to a blood draw.

¶ 70. Padley attempts to distinguish our hypothetical statute from WIS. STAT. § 343.305(3)(ar)2. on the grounds that § 343.305(3)(ar)2., unlike the hypothetical statute, creates "a threat of a direct penalty for the exercise of constitutional rights." However, what Padley characterizes as a "threat" is correctly characterized as a choice. This is plainly a choice designed to induce, but it is a choice nonetheless. And, as we have explained, offering this choice, rather than requiring a blood draw, makes all the difference.

¶ 71. Nowhere does Padley develop a legal argument that the State cannot present a suspect with the hard choice of giving up a constitutional right or accepting a permissible penalty. For the first time in her reply brief, Padley cites to a number of United States Supreme Court cases that she contends stand for such a proposition. *See, e.g., Griffin v. California,* 380 U.S. 609, 614 (1965) (allowing prosecutor to comment on defendant's decision not to testify was an impermissible "penalty imposed by courts for exercising a constitutional privilege" that "cuts down on the privilege by making its assertion costly."). Padley does not explain, however, how this line of cases applies in the implied consent law context or to the particular facts in the instant case.

¶ 72. Moreover, Padley fails to adequately explain why her argument is not in conflict with Wisconsin precedent establishing that voluntary consent to a blood draw is not negated by the fact that consent was procured by informing a suspect that the alternative is a penalty for refusing to comply with the implied consent law. *See Walitalo,* 256 Wis. 2d 1032. In *Walitalo,* this court considered an argument that "the threatened

585

sanction of lost driving privileges constitutes a coercive measure that invalidates [Walitalo's] consent for Fourth Amendment purposes." *Id.*, ¶ 6. The court rejected Walitalo's argument, opining that

> by reading the informing the accused form, [the officer] simply stated the truth: If Walitalo refused to submit to a chemical test, his driving privileges would be revoked. This statement did not involve any deceit or trickery, but instead accurately informed Walitalo of his precise legal situation.

*Id.*, ¶ 11. The court concluded that because the officer engaged in "no actual coercion or improper police conduct," Walitalo's consent was voluntarily given. *Id.*

¶ 73. Attempting to neutralize *Walitalo*, Padley makes a difficult-to-interpret argument based on the United States Supreme Court's decision in *McNeely*. She asserts that *McNeely* held that "the Fourth Amendment does not permit blood draws as a *per se* exception to the warrant preference," and this "renders false" the proposition in *Walitalo* that the "Informing the Accused" advisement "is true." However, Padley does not explain what aspect of *McNeely* renders false any statement in the "Informing the Accused" form. As explained above, *McNeely* did not address the validity of a search conducted pursuant to a driver's actual consent in the context of an implied consent law scheme.

¶ 74. In sum, Padley fails to raise an argument that undermines the State's clear and positive proof of voluntary consent. More specifically, she fails to support her assertion that Wis. Stat. § 343.305(3)(ar)2. allows police to "attach an affirmative penalty or punishment to the mere exercise of a constitutional right," or that doing so invalidates her consent. Therefore, we conclude that Padley fails to point to a way in which the

deputy misrepresented Padley's legal rights when he read to her from the "Informing the Accused" form and, thus, she fails to establish that her consent to the search was invalid.

## IV. The Deputy's "Reason to Believe" That Padley Committed a Traffic Law Violation

¶ 75. Independent of the constitutional arguments addressed above, Padley argues that the results of her blood draw should be suppressed because the circuit court clearly erred in finding particular facts, and also erred as a matter of law, in deciding that the deputy had the requisite "reason to believe" that Padley had committed a traffic violation pursuant to Wɪꜱ. Sᴛᴀᴛ. § 343.305(3)(ar)2. As we now explain, even assuming to be true the facts that Padley argues the circuit court should have found, the deputy had a "reason to believe" that she had committed a violation.

¶ 76. Padley does not dispute that, pursuant to Wɪꜱ. Sᴛᴀᴛ. § 346.33(1m), if she interfered with the progress of the motorcycle in attempting the U-turn, this would have been a traffic violation under the terms of Wɪꜱ. Sᴛᴀᴛ. § 343.305(3)(ar)2. She argues, however, that the facts available to the deputy did not provide sufficient reason to believe that she attempted a U-turn that interfered with the progress of the motorcycle and, thus, the deputy did not have the authority to request a search under § 343.305(3)(ar)2., and any consent given pursuant to that request cannot be valid. Padley now argues:

> Confronted with the fact that [] Padley's car was in its own lane of travel at the time of impact, skid marks

587

leading into her lane from the motorcycle's lane, [Padley's] statement that no one was coming when she started her u-turn, the distance [the deputy] could observe that the motorcycle driver would have to see and react to [Padley's] car (assuming he was traveling at the speed limit), and without obtaining any information from that driver as to his speed or efforts to stop . . . it was not reasonable for [the deputy] to determine that [] Padley, and not the operator of the motorcycle, had violated a traffic law.

¶ 77. No Wisconsin appellate court has previously reviewed any application of Wis. Stat. § 343.305(3)(ar)2. Thus, we lack a previous interpretation of the "reason to believe" standard in this context. However, the phrase "reason to believe" has been interpreted in the context of the circumstances under which a law enforcement officer may request a preliminary breath test from a commercial driver. *See Renz*, 231 Wis. 2d at 309. In *Renz*, the court interpreted "reason to believe" as requiring only "a minimum of suspicion." *Id.* ("There is a great degree of difference between the minimum of suspicion indicated by the language 'reason to believe' . . . and the degree of proof required to establish probable cause for arrest."). When the legislature uses the same phrase in two different statutes addressing similar topics, it is a strong indication that "the legislature intended them to have the same meaning in both statutes." *F.R. v. T.B.*, 225 Wis. 2d 628, 639, 593 N.W.2d 840 (Ct. App. 1999). Thus, we conclude that the question before us is whether the facts found by the circuit court provided the deputy with a "minimal suspicion" that Padley had committed a traffic violation.

¶ 78. Padley argues that the circuit court erred in finding some relevant facts, including finding that, when the deputy arrived at the scene, Padley's car was

in the middle of the road. However, even if we assume without deciding that the version of the facts that Padley now advances is accurate, we nonetheless conclude based on these assumed facts that there is sufficient evidence to support the conclusion that the deputy had a "reason to believe" that Padley attempted to execute an illegal U-turn.

¶ 79. The skid marks from the motorcycle leading to the point of impact suggest that the motorcycle driver braked hard as Padley abruptly attempted the U-turn. One reasonable explanation for the fact that the motorcycle's skid marks start in one lane and continue into the other lane, into which Padley turned, is that the motorcycle deviated into that lane in an attempt to drive around Padley, who had surprised the motorcycle driver with the manner in which she attempted the U-turn. This could have been the result if Padley slowed and attempted the turn abruptly, without sufficiently checking behind her or by miscalculating the speed of the approaching motorcycle. And, Padley fails to point to evidence available to the deputy supporting the inference that the motorcyclist was wholly at fault in causing the crash. Thus, the deputy could reasonably have had at least a suspicion that the collision occurred on the side of the road onto which Padley was turning because, in whole or substantial part, Padley surprised the trailing motorcyclist by attempting to execute a hazardously abrupt U-turn. This was not the only possibility from the available evidence, but it was a reasonable possibility.

¶ 80. Based on these facts, we conclude that the record supports the circuit court's conclusion that the deputy had the requisite "reason to believe" that Padley had violated a traffic law by attempting a U-turn without due care and that interfered with other traffic.

## CONCLUSION

¶ 81. For the foregoing reasons, we conclude that Padley fails to demonstrate that her consent to the blood draw was invalid because WIS. STAT. § 343.305(3)(ar)2. is facially unconstitutional or because her consent was involuntary. In addition, the circuit court did not err as a matter of law in concluding that the investigating deputy had a "reason to believe" that Padley had committed a traffic law violation under § 343.305(3)(ar)2. Accordingly, we affirm the decision of the circuit court denying Padley's motion to suppress.

*By the Court.*—Judgment affirmed.